## Case No. 15,158.

### UNITED STATES v. The FRANCIS HATCH.

[4 Am. Law Reg. (N. S.) 289.]

District Court, D. Maryland. Dec. Term, 1864.

PRIZE — PROHIBITED TRADE — TREASURY REGULATIONS—EFFECT OF.

1. Under the act of congress of July 13, 1861, § 5 [12 Stat. 257], goods forming the cargo of a vessel proceeding to a point in the insurrectionary states are liable to forfeiture only while in transitu. And the vessel only while the contraband cargo is on board.

[Cited in U. S. v. Stevenson, Case No. 16,-396.]

2. But under the regulations made by the secretary of the treasury by authority of the acts of July 13, 1861 [12 Stat. 257], May 20, 1862 [12 Stat. 404], and July 2, 1864 [13 Stat. 375], a vessel engaging in trade with the insurrectionary districts is liable to forfeiture even after the termination of the prohibited voyage and the discharge of the contraband cargo.

3. The imposing of such forfeiture is within the power to make regulations conferred on the secretary of the treasury by the acts of congress. Congress has the constitutional right to confer such power, though quasi legislative, on the executive

4. Even if it be necessary for congress itself to exercise such power, it may be considered to have ratified and adopted such regulations by the act of July 2, 1864, § 3.

5. Therefore, where a vessel had been engaged in prohibited trade, but, before the libel was filed, had completed her voyage and discharged her cargo, a forfeiture was decreed by virtue of the regulations established by the secretary of the treasury.

Libel for forfeiture.

Addison & Thayer, for the United States. Carter & Ridgeley, for claimants.

GILES, District Judge. The libel in this case has been filed by the district attorney of the United States, in which it is charged that the schooner Francis Hatch has conveyed passengers and merchandise from the city of New York to that part of the state of Virginia declared to be in insurrection by the president's proclamation, without a license or permit from the proper authorities. There are some nine counts or articles in the libel, propounding the matters relied on as grounds or causes of forfeiture, some drawn under the act of July 13, 1861; the others under the act of May 20, 1862, and its supplements, and the various rules and regulations of the secretary of the treasury, prepared under the authority given to him by said acts. At the commencement of the trial of this case, the various claimants of that part of the cargo which was brought from the city of New York to this city, having satisfied the court by

competent testimony that they were entirely innocent of any intention to violate any of the laws of their country, and had no knowledge of the shipment of goods on board the Francis Hatch, to be delivered in Virginia; and this not being contested by the district attorney, the court said, when it passed a final decree in this case, it would dismiss the libel as to the said cargo, and award the same to the several claimants. Two claims were filed for the vessel: one by John P. Williams, claiming to be the owner of the same, and the other by Messrs. Capron & Co., of this city, claiming as bailees of the vessel by virtue of a mortgage and power of attorney from John P. Williams, dated the 14th day of January, 1864, and also as lien creditors for advances and disbursements, on account of said vessel, to a large amount.

In the answers filed by the claimants it was expressly denied that the said vessel had carried either passengers or merchandise to Virginia, as charged in the libel. But the testimony showed that on three voyages made by the Francis Hatch between New York City and this port, she put out into a yawl-boat passengers and merchandise, just opposite Gwyn's Island, in the Chesapeake Bay; that this was always done at night; and on the several occasions, a man who passed then under the name of Hayden, was one of the party so put out. Gwyn's Island is in the Chesapeake Bay, quite near to the Virginia shore, and just below the mouth of the Piankatank river. A large amount of testimony was given, which it will not be necessary for the purposes of this opinion to refer to, further than to say: it convinced the court that the passengers and goods so put out from the Francis Hatch in the Chesapeake Bay, were intended to be landed, and were so landed, either on Gwyn's Island or on the adjacent Virginia shore. The evidence also shows that the Francis Hatch was not seized until she had completed her last voyage in November, and when she was moored to the wharf and had been entered at the custom-house at this port. The counsel for the claimants contended that as the voyage was ended, and the cargo intended for a state in insurrection, no longer on board; and that as the vessel when seized was not proceeding to a state in insurrection, there could be no forfeiture in this case under the 5th section of the act of July 13th, 1861; and that there can be no forfeiture of the vessel under the act of May 20th 1862, and its supplement, and under the rules and regulations of the secretary of the treasury, because by neither the said act nor its supplement is the vessel declared to be forfeited; and although it is provided by the several series of regulations adopted from time to time by the secretary of the treasury, with the approval of the president, that a vessel violating the same shall be forfeited, such a provision is unconstitutional and void, the secretary of the treasury, under the power given to him by the said acts of

congress "to make such rules and regulations as may be necessary and proper to carry into effect the purpose of said acts," had no authority to forfeit the vessel, &c., and that even if congress had intended to impart to him any such authority, they had no constitutional right to do so, as it would be the exercise of a legislative power by a branch of the executive department of the government.

I think I state thus briefly the substance of the learned and able defence made in this case by the counsel for the claimants. They referred the court to two decisions made in this circuit by the late chief justice of the supreme court. Upon the first point made by them they cited the decision of Judge Taney in the case of U. S. v. Two Thousand Bushels of Wheat [Case No. 16,589], Penn & Mitchel claimants, made last June, on appeal from the common law side of this court. That case was this:—The wheat had been brought to this port from St. Mary's county and consigned to the claimants, who stored it here for sale, and who made advances on it to the amount of its full value. They had no reason to suppose that it was not grown in this state, although it appeared from the evidence that it was brought from Virginia across the Potomac into St. Mary's county before being shipped to Baltimore. It was in store here ten days before it was seized. It was tried before a jury in this court, and I instructed the jury that, if they found these facts, their verdict must be for the claimants. From this decision the government took an appeal to the circuit court, and the decision of this court was affirmed. In delivering his opinion Judge Taney construes the act of July 13th, 1861, as follows: His language is: "Taking the different provisions of this law together, it appears to me that the forfeiture attaches to the goods when they are on their passage, and adheres to them while they remain in that condition, that is in transitu between the forbidden places, and no longer." In a subsequent part of his opinion, he says: "The words 'together with the vessel or vehicle conveying the same' confirm this conclusion. The vessel is not forfeited unless the unlawful cargo is actually on board; and it would be a strained and unreasonable construction of these words to forfeit the vessel when it had a lawful cargo not liable to forfeiture. The vessel is forfeited when and while it is carrying on commercial intercourse between the United States and the interdicted places. The forfeiture adheres to the vessel while she is thus engaged, and no longer. It is only when the cargo is unlawful the vessel conveying the same is forfeited; and when that cargo is landed and separated from the vessel it cannot be said to be conveying the same, and is not forfeited by any provision of the said law."

Now, beside the respect which I should entertain for any opinion to which he gave the sanction of his great name, he was the presiding judge in this circuit; and his decisions,

until reversed by the supreme court, are the law of this court and binding on it. In pursuance of that decision there can be no forfeiture of the Francis Hatch under the 5th section of the act of July 13th, 1861. Now can this vessel be forfeited for a violation of the rules and regulations of the secretary of the treasury? To oppose such forfeiture the counsel for the claimants have referred to the other decision of Judge Taney, mentioned above, which was made in the case of U. S. v. Box of Dry Goods [unreported], Geo. W. Carpenter, claimant. Now, in that case, the dry goods were intended to be carried from this port to the claimant, in Charles county, in this state, and were seized in this port by the collector on the charge that a fraud had been committed in obtaining the permit; and that in such case the goods were forfeited by the regulations of the secretary of the treasury, as well as by the act of May 20th, 1862. The chief justice held in that case that neither congress nor the secretary of the treasury had any constitutional authority to place any restrictions upon the internal trade of Maryland, as this was a subject-matter beyond the jurisdiction of congress, who, under the constitution, had power only "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." He held, therefore, that so far as the regulations of the secretary of the treasury applied to the trade between Baltimore and the lower counties of this state, they were void; and that, therefore, the box of dry goods seized in that case must be restored to the owner. But the question that I am now called upon to decide has not yet been decided by any of the federal courts, so far as I have been able to learn. No case has been cited by the counsel on either side, and I have heard of none. It is presented, therefore, for the first time, and is a question of great importance, to which I have given my most careful deliberation. Neither the act of May 20th, 1862, nor that of July 2d, 1864, provides for a forfeiture of the vessel. But the act of May 20th, 1862, contains a provision forfeiting any goods, wares, or merchandise transported or attempted to be transported in violation of the said act, or of any regulation of the secretary of the treasury, established in pursuance of the authority given to him by said act. But both acts authorize the secretary of the treasury to establish all such general or special regulations as may be necessary to carry into effect the purposes of the acts. The language of the last act (July 2d, 1864) is: "That the secretary of the treasury, with the approval of the president, shall make such rules and regulations as are necessary to secure the proper and economical execution of the provisions of this act." And one of the provisions of said last-mentioned act was, "That no goods, wares, or merchandise shall be taken into a state declared in insurrection, or transported therein, except to and from such places and to such monthly

amounts as shall have been previously agreed upon in writing by the commanding-general of the department in which such places are situated, and an officer designated by the secretary of the treasury for that purpose." Four series of rules and regulations have been made and published by the secretary of the treasury, and approved by the president., viz.: Those of the 28th August, 1862; those of the 31st of March, 1863; those of the 11th September, 1863, and lastly, those of the 30th July, 1864. I have not been able to obtain a copy of the first series, but the three last contain provisions for the forfeiture of a vessel found violating any of the said regulations. I shall quote (as far as it may be necessary) only the provisions or regulations of the last series. They were approved by the president, July 30th, 1864. 1st regulation is as follows: "No goods, wares, or merchandise will be allowed to be transported to, from, or within any state or part of a state, under restriction or declared in insurrection, except under permits, certificates, and clearances, as hereinafter provided." The 45th regulation is: "All vessels, boats, and other vehicles used for transportation, violating regulations and local rules, and all cotton, tobacco, or other products or merchandise shipped or transported or purchased or sold in violation thereof, will be forfeited to the United States." It is not pretended in this case that the "Francis Hatch" had on any of the three voyages mentioned, any permit to land goods in Virginia.

Now, the first question is, what power did congress intend to give to the secretary of the treasury, when it authorized him to make such rules and regulations as are necessary to secure the proper execution of the provisions of the act they passed? Did they authorize him to enforce the due observance of the regulations he might establish by penalties? This will depend upon the true meaning and import of the words "to regulate." Worcester, in the last edition of his dictionary, defines the verb "to regulate" as follows: "to reduce to order, to direct, to rule, to govern, to conduct," &c. And in the constitution of the United States, framed by some of the greatest men of their day, and a paper that will command the admiration of all time, this word "regulate" is used several times. In article 1st, section 8, subsection 3, power is given to congress "to regulate commerce with foreign nations, and among the several states and with the Indian tribes." Under which grant of power congress has, from time to time, passed various laws to regulate our foreign and coastwise trade, and enforced their due observance with heavy penalties. No one, I believe, has ever questioned the constitutionality of such laws. Again, in same section, subsection 14, power is given "to make rules for the government and regulation of the land and naval forces." Under this grant of power congress passed and adopted "The Articles of War," which, in many cases

in time of war, provide the punishment of death. And in article 4th, section 3, power is given to congress "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Under this grant of power congress has, for more than seventy years, punished all crimes committed in the several territories of the United States until their admission as states into the Union. Without dwelling further upon this point, it appears to me, that the word "regulation" means something more than the mere preparation of a set of rules in reference to any particular subject. It includes the power to enforce the due observance of those rules by penalties and forfeitures. But, say the learned counsel for the claimants, while congress possess this power themselves, they cannot impart or delegate it to any branch of the executive department of the government. Now, I am free to admit that this is a question of some difficulty. But the rule which governs courts of justice, when deciding upon the constitutionality of an act of a co-ordinate department of the government, is, "that unless the contrary is clearly demonstrated, the presumption must always be in favor of the validity of such act. Now, we have four series of regulations to govern the commercial intercourse between the states in insurrection and the rest of the United States. The three first of these regulations were prepared and sanctioned by the late secretary of the treasury, a gentleman who is now placed at the head of the judiciary of the United States; and the last regulations prepared by the present secretary of the treasury—both gentlemen of large experience in the public service. In a case of doubt, therefore, it is the duty of the federal judiciary to uphold and maintain these regulations; as it would be their imperative duty, if their unconstitutionality was clearly demonstrated, to refuse to recognise or enforce them. I grant that the construction I give to the word "regulations" includes the exercise of a quasi legislative power. But this is nothing new in the history and operations of our government. The president, by and through the secretary of war, prepared the regulations for the government of the army; many of which prescribe punishments and define offences not specified in the articles of war. And the supreme court, in [Gratiot v. U. S.] 4 How. [45 U. S.] 117, say: "As to the army regulations, this court has too repeatedly said that they have the force of law," &c. In this state, as in most of the states, its constitution or bill of rights contained a provision that the legislative, executive, and judicial powers of the government ought to be separate and distinct from each other. Yet in a late case which came before the court of appeals of this state, in which the constitutionality of the Baltimore police bill came under review, a bill in which the power of appointing the commissioners was reserved to the legislature,

the court maintained the validity of the said law, although the article in the bill of rights to which I have referred, was much relied upon in the argument. And also in this state, the legislature has again and again granted to municipal corporations of its own creation the power of imposing taxes, one of the highest powers belonging to the legislative department. And the exercise of this power by the municipal corporation has been sustained. This provision in the bill of rights to which I have referred is intended, no doubt, to prevent one department of the government from usurping the power confided to either of the other departments. It was so held in the case of Crane v. Meginnis, 1 Gill & J. 463, and in the case of Regents of the University of Maryland v. Williams, 9 Gill. & J. 410; and is not to be construed as a prohibition upon the legislative department from authorizing a branch of the executive department to exercise quasi legislative powers in a prescribed case. Speaking of this article in the bill of rights, Justice Tuck, in delivering the opinion of the court in the Police Bill Case, to which I have referred (15 Md. 457), says: "But this article is not to be interpreted as enjoining a complete separation between these several departments. Practically, it has never been so in any of the states in whose fundamental law the principle has been attested." And he further says: "Entire practical separation was not designed." And that it was designed to engraft this principle in our system "only so far as comported with free government, as an inhibition upon the exercise by one department of powers conferred on any other by the constitution." And in the case of State of Pennsylvania v. Wheeling & B. Bridge Co., 18 How. [59 U. S.] 429, the supreme court sustained congress in the exercise of what was certainly a quasi judicial power. The supreme court in a previous case (13 How. [54 U. S.] 518) had decreed that the Wheeling bridge was a nuisance, and should be removed. Since the passing of said decree congress had, by the act of August 31st, 1852, declared the said bridge to be a lawful structure in its present position and elevation. A bill was filed to enforce the decree for the removal of the bridge, and the supreme court, in 18 How. [59 U. S.] 429, refused to enforce it, and sustained the action of congress in the premises. Sustaining the law, it is true, upon the ground that it was the exercise by congress of the power to regulate commerce between the states.

There is another view of this question which seems to me to be very clear. If the authority of the secretary to enact these regulations and enforce their observance by forfeitures, be doubtful, congress possessed the power to ratify and adopt them. This doctrine is discussed by Judge Grier, in delivering the opinion of the supreme court in the Prize Cases, reported in 2 Black [67 U. S.] 679. The question in those cases was the validity of the blockade proclaimed by the

president before the meeting of congress in 1861. That learned judge held that, if it were necessary to the technical existence of a war, that it should have a legislative sanction, such sanction was found in the various laws subsequently passed by congress for carrying on the war. Now congress, by the 3d section of the act of July 2d, 1864, provides for the disposition of money received from the sales of captured property, &c., or from fees collected under the rules and regulations made by the secretary of the treasury, and approved by the president respectively, 28th August, 1862, 31st March, 1863, and 11th September, 1863. Now each of these series of regulations contained a provision forfeiting any vessel engaged in their violation.

I am of the opinion, therefore, that the regulations of the secretary of the treasury, to which I have referred, are valid, and that by them this vessel must be forfeited to the United States, and I will sign a decree to that effect. As I said before, the evidence has convinced me that this vessel, on her last voyage, conveyed passengers and goods on their way to Virginia, who reached there; that this was done with the knowledge of Hayden (whose true name is Snowden), and who was himself on board, and who was the real owner of the "Francis Hatch," the name of John P. Williams being used for the purpose of deception. I shall not now pass upon the claim of Messrs. Capron & Co. for advances under their power of attorney. This is not the proper time to do so. That claim, if it exists and can be maintained, must be filed under and subject to the requisitions of the act of congress of March 3d, 1863 [12 Stat. 759]. I shall not pass upon it now for another reason: Mr. Capron is, I understand, held in custody, charged with a violation of certain provisions of the act of July 2d, 1864, and may be indicted by a grand jury and tried on the charge. I would not, therefore, discuss the facts proved in relation to his connection with this vessel at this time, lest I might do him injustice, or prejudice any defence he might be able to make on such trial.